CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

6/2/2022

JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA LYNCHBURG DIVISION

| | |
|---|---|
| LILLIAN HOOPER, | ) |
| | ) |
| | ) Civil Action No. __6:22CV00032__ |
| *Plaintiff*, | ) |
| | ) |
| V. | ) |
| | ) |
| LYNCHBURG CARE CENTER, LLC, | ) |
| *d/b/a* LYNCHBURG HEALTH & REHABILITATION | ) |
| CENTER | ) |
| | ) |
| **SERVE**: R/A: C T Corporation System | ) |
| 4701 Cox Rd Ste 285 | ) |
| Glen Allen, VA, 23060 – 6808 | ) |
| | ) **JURY TRIAL DEMANDED** |
| AND | ) |
| | ) |
| MEDICAL FACILITIES OF AMERICA IV (4) | ) |
| LIMITED PARTNERSHIP | ) |
| | ) |
| **SERVE**: R/A: Medical Facilities of America, Inc. | ) |
| 2917 Penn Forest Blvd. #300 | ) |
| Roanoke, VA, 24018 | ) |
| | ) |
| *Defendants*. | ) |

## COMPLAINT

Lillian Hooper ("Ms. Hooper" or "Plaintiff"), by and through undersigned counsel, brings this action against Defendants Lynchburg Care Center, LLC, d/b/a Lynchburg Health & Rehabilitation Center ("LHRC" or "Defendant 1") and Medical Facilities of America IV (4) Limited Partnership ("MFA" or "Defendant 2") under the Fair Labor Standards Act, 29 U.S.C. § 203 et seq, Va. Code Ann. § 40.1-29 et seq., Va. Code Ann. § 40.1-27.3, and the common law of Virginia.

1

## I.      INTRODUCTION

1.      This case involves falsification of medical records, fraud, wage theft, and retaliation committed by Defendants against whistleblower-plaintiff, Ms. Hooper.  Plaintiff has evidence that Defendants, through their authorized agents: (1) failed to pay her the overtime wages she earned; (2) ordered her to falsify a patient's medical record to indicate she had administered highly-controlled medication not even present in the facility on the date in question; and (3) terminated her when she refused to falsely certify that record.

## II.     JURISDICTION AND VENUE

2.      This action arises under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203 et seq, Virginia's wage theft statute: Va. Code Ann. § 40.1-29 et seq., Virginia's whistleblower statute: Va. Code Ann. § 40.1-27.3, and the common law of Virginia (Bowman claim).

3.      This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

4.      This Court has supplemental subject matter jurisdiction over the claims arising under Virginia state law because they are so related to the federal claims that they form part of the same case or controversy.  28 U.S.C.§ 1367(a).

5.      Venue lies in the Western District of Virginia, Lynchburg Division, under 28 U.S.C. § 1391(b) & (c) because Lynchburg Health & Rehabilitation Center resides here and a substantial part of the events or omissions giving rise to the claim occurred here.

## III.    PARTIES

6.      Plaintiff, Lillian Hooper, is an adult citizen and resident of the Commonwealth of Virginia.

7.      Plaintiff was employed as a Charge Nurse at Defendants' facility located at 5615 Seminole Ave., Lynchburg, Virginia 24502 until she was unlawfully terminated.

8.      Defendant Lynchburg Care Center, LLC, is a Virginia limited liability company doing business as Lynchburg Health & Rehabilitation Center ("LHRC") with its principal place of business located at 5615 Seminole Ave., Lynchburg, Virginia 24502 and its principal office address registered at 2917 Penn Forest Blvd Ste 200, Roanoke, VA, 24018.  LHRC advertises itself as an affiliate or subsidiary of Medical Facilities of America and is featured on Medical Facilities of America's website, www.mfa.net, at www.mfa.net/center/lynchburg-health-rehabilitation-center.  (See **Exhibit 6**, showing contract between Medical Facilities of America and Plaintiff.)

9.      Defendant Medical Facilities of America IV (4) Limited Partnership ("MFA") is a Virginia limited partnership doing business as Lynchburg Health & Rehabilitation Center (Lynchburg CI) with its principal office registered as 2917 Penn Forest Boulevard, S.W., Roanoke, Virginia, 24018.  MFA's registered agent is Medical Facilities of America, Inc.

## IV.   LEGAL FRAMEWORK

### A. <u>The Fair Labor Standards Act</u>

10.      The Fair Labor Standards Act ("FLSA" or "the Act"), 29 U.S.C. § 203 et seq., establishes minimum wage, overtime pay, record keeping, and employment standards for employees in the private sector and in federal, state, and local government.  Defendants are subject to the FLSA's overtime requirements because their annual gross volume of sales is not less than $500,000.  Moreover all "skilled nursing facilities, nursing facilities, assisted living facilities, residential care facilities and intermediate care facilities for intellectually and developmentally disabled individuals must comply with the minimum wage, overtime and youth employment

requirements of the FLSA."  (DOL Fact Sheet #54 – The Health Care Industry and Calculating Overtime Pay; **Exhibit 1**.)

11.     Under the FLSA, non-exempt hourly employees such as Ms. Hooper must receive overtime pay for all hours worked over 40 hours in a workweek at a rate not less than time and one-half (1.5) their regular rate of pay that week.

12.     For purposes of calculating overtime pay, an employee's "regular rate of pay" is a calculation that takes into account not only the employee's standard hourly rate, but also all shift differentials, incentives, and bonus compensation attributed to any workweek in which the employee worked more than 40 hours. (See **Exhibit 1**.)

13.     According to the Department of Labor ("DOL"), underpayment of overtime wages is a "common FLSA violation." Id.

14.     In response to these "common FLSA violations found by the Wage and Hour Division during investigations in the health care industry relating to the calculation of overtime pay," the DOL published Fact Sheet #54, which provides specific instructions on "The Health Care Industry and Calculating Overtime Pay" to help health care facilities comply with the FLSA and avoid violations. (See id.)

15.     Per Fact Sheet #54, the FLSA requires that overtime wages for hourly employees such as Ms. Hooper be calculated using the following methodology:

        a.     Non-discretionary bonuses, such as retention bonuses and attendance

        bonuses, must be included in the employee's regular rate of pay for any

        week in which they are attributed.  Retention bonuses are often paid over

        several months, in which case, the amount of the bonus is divided by the

4

number of weeks over which it is paid to determine the amount attributed to each week during that period.

b.    Supplemental shift bonuses (shift differentials) must be included in the employee's regular rate of pay for any week in which they are paid;

c.    To calculate an employee's regular rate of pay each week, begin by multiplying the number of hours worked at each hourly rate of pay by the hourly rate of that category.  For example, if a nurse worked 20 hours at $30/hr, 15 hours at $32/hr, and 10 hours at $34/hr, she earns $600 (20 x $30) + $480 (15 x $32) + $340 (10 x 34), for a total of **$1,420** ($600 + $480 + $340);

d.    Then add any retention or attendance bonuses attributed to that week to this total.  If this nurse earned a $6,000 bonus paid over 12 weeks, then **$500** ($6,000/12) of this bonus is attributed to this and every other workweek during that span of time.  Moreover, if this nurse worked two additional shifts that week and earned a $150 bonus for each shift, then add **$300** (2 x $150) to this total;

e.    To calculate the total base wage, add all amounts calculated under steps c and d.  Here, the **total base wage equals $2,220** ($1,420 + $500 + $300);

f.    To calculate the nurse's regular rate of pay, divide the total base wage by the total number of hours worked that week.  In the previous example, the nurse worked a total of 45 hours (20 + 15 + 10), so one would divide the total base wage of $2,220 by the 45 hours worked that week.  This yields

a regular rate of pay of $49.33 – nearly 50% higher than the highest shift differential wage she earned during this period;

g.    For the five hours worked in excess of 40 this week, the nurse in the above example would be paid $74/hr ($49.33 x 1.5), not $45/hr, as would have been the case had the employer merely multiplied her lowest hourly wage of $30/hr by 1.5.

16.    Under § 216(b) of the FLSA, "Any employer who violates the provisions of … section 207 of this title [concerning overtime wages] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages … and in an additional equal amount as liquidated damages" in addition to attorney fees and costs.

**B.   Virginia's Wage Theft Statute, Va. Code Ann. § 40.1-29**

17.    Under Va. Code Ann. § 40.1-29(J), "if an employer fails to pay wages to an employee in accordance with this section or § 40.1-29.2, the employee may bring an action, individually … against the employer in a court of competent jurisdiction to recover payment of the wages, and the court shall award the wages owed, an additional equal amount as liquidated damages, plus prejudgment interest thereon as provided in subsection G [8%], and reasonable attorney fees and costs."

18.    Moreover, "[i]f the court finds that the employer knowingly failed to pay wages to an employee in accordance with this section or § 40.1-29.2, the court shall award the employee an amount equal to triple the amount of wages due and reasonable attorney fees and costs." Id.  "[A] person acts 'knowingly' if the person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information.  Va. Code Ann. § 40.1-29(K).

19.     Establishing that a person acted knowingly shall not require proof of specific intent to defraud." Id.

**C.  Virginia's Whistleblower Statute, Va. Code § 40.1-27.3**

20.     Under Va. Code § 40.1-27.3, "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee: [o]r a person acting on behalf of the employee in good faith reports a violation of any federal or state law or regulation to a supervisor … [or] [r]efuses to engage in a criminal act that would subject the employee to criminal liability."

21.     Under Va. Code § 40.1-27.3(C), "A person who alleges a violation of this section may bring a civil action in a court of competent jurisdiction within one year of the employer's prohibited retaliatory action.  The court may order as a remedy to the employee (i) an injunction to restrain continued violation of this section, (ii) the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent position, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs.

**D.  Federal & State Criminal Laws Governing Falsification of Patient Medical Records**

22.     Under Va. Code § 18.2-260.1, falsifying patient medical records is a crime in Virginia. ("Any person who, with the intent to defraud, falsifies any patient record shall be guilty of a Class 1 misdemeanor.").

23.     Under Va. Code §§ 18.2-256, 257, conspiring or attempting to commit a criminal offense is a crime in Virginia.

24.     Under Va. Code § 63.2-522, making false statements or misrepresentations to the government or the State Board of Health to receive benefits from government programs for which one is not eligible is larceny in Virginia.

25.     Under 18 U.S.C. § 1347-1349, health care fraud is a federal offense, as is conspiracy or attempt to commit health care fraud to receive, by false pretenses, representations, or promises, any money or property from a government health care program for which one would not, absent the misrepresentation, be eligible.

### E. __Wrongful Discharge under Virginia Common Law (Bowman Claim)__

26.     In Virginia, the at-will employment doctrine is not absolute.  One exception is the "public policy exception," commonly referred to as a "Bowman claim."

27.     To succeed on a Bowman claim, the employee must show that the statute falls within one of two categories: (1) the statute explicitly states that it expresses a public policy of Virginia; or, the "far more common category," (2) the statute is designed to protect the property rights, personal freedoms, health, safety, or welfare of the public and the employer violated that public policy and wrongfully discharged the employee for performing a duty under that statute or for refusing to engage in its violation.  Anderson v. ITT Indus. Corp., 92 F. Supp. 2d 516, 520 (E.D. Va. 2000) (holding that plaintiff stated a valid Bowman claim when he alleged that employer terminated him for refusing to commit the crime of forgery).

28.     The discharged employee must also show that he or she is within the class of persons the statute is designed to protect.  This may be accomplished by showing that the employee has a duty under the statute.  A person need not be a victim of the statutory violation to fall within the statute's protective reach.  Rather, in Virginia, it is well settled that a statute's protective reach

extends "beyond the class of persons who are victims of its violation.  Indeed, a statute's protective reach may extend to those who have a legal duty under that statute." <u>Anderson</u>, 92 F. Supp. at 521.

29.     Under Virginia law, terminating an employee for refusing to engage in a criminal act is a textbook Bowman claim.  <u>Id</u>. at 523 (holding that a plaintiff "states a valid Bowman wrongful discharge claim where, as here, he alleges that his employer fired him for refusing to engage in statutorily prohibited conduct").

30.     An employee alleging a valid Bowman claim is entitled to both compensatory and punitive damages.

## V.     STATEMENT OF FACTS

31.     Plaintiff, Ms. Hooper, is a Charge Nurse who was employed at LHRC.

32.     Ms. Hooper received her LPN license on 03/02/2021 and has 16 years of experience working in the healthcare field.

33.     Ms. Hooper is a compassionate nurse, known for her kindness, strong work ethic, integrity, and professionalism.  Ms. Hooper has never had <u>any</u> negative performance evaluations ("write-ups") prior to her sudden, unlawful termination from LHRC.

### Prior Service at LHRC

34.     Ms. Hooper has worked for LHRC during several periods over the past seven years dating back to 2015.

35.     Each previous time Ms. Hooper left LHRC, it was a voluntary departure as a member of a large exodus of employees dissatisfied with how LHRC was being operated.

36.     Each time Ms. Hooper returned to LHRC, it was as a result of being highly sought-after by LHRC's "new management" which promised Ms. Hooper – whom LHRC valued as a

hard-working model employee – they had "fixed" all prior issues.  When that proved untrue, Ms. Hooper would voluntarily leave again and the cycle would repeat itself.

## **LHRC's Recruitment Efforts to Incentivize Ms. Hooper to Return**

37.     On or about March 15, 2022, Ms. Hooper once again returned to LHRC as a Charge Nurse.

38.     Prior to returning, Ms. Hooper had been happily employed by Autumn Care of Altavista.

39.     Autumn Care (like LHRC) considered Ms. Hooper a hard-working, model employee.  In fact, Ms. Hooper was so highly sought-after that Autumn Care and LHRC engaged in a *de facto* bidding war to retain Ms. Hooper's services.

40.     Ultimately, Ms. Hooper – persuaded by LHRC's persistence, recruitment efforts, financial incentives, signing bonuses, and renewed false promises of better management – left Autumn Care and rejoined LHRC.

## **Job Title and Responsibilities**

41.     Ms. Hooper returned to work at LHRC as a Charge Nurse under the supervision of Rebecca Keith ("Ms. Keith"), the Director of Nursing ("DON"), and Linda Miles ("Ms. Miles"), the Corporate Nurse.

42.     Both Ms. Keith and Ms. Miles were new additions to LHRC and were not employed by Defendants at this facility when Ms. Hooper had worked there in the past.

43.     As a Charge Nurse, Ms. Hooper's job duties included supervising Certified Nursing Assistants ("CNAs"), treating wounds, administering medication, and assisting CNAs, as needed.

44.     Ms. Hooper, like all LHRC Charge Nurses, was assigned a specific floor and list of patients for rounds.

**LHRC under State Investigation; Repeat Citations for Violations of Law; Facing Closure**

45.     When Ms. Hooper began work on or about March 15, 2022, all appeared fine.  Ms. Keith represented that the facility was "doing well" and refocusing its efforts on patient care.

46.     It did not take long for Ms. Hooper to learn the truth: LHRC had been repeatedly cited by the state for violations and was facing closure if management did not quickly bring the facility into compliance with applicable state laws governing rehabilitation, assisted living, and/or nursing facilities.

47.     About a week into her most recent tenure, Ms. Hooper learned that LHRC was under investigation because it had failed state inspection on various grounds.

48.     Those grounds included failure to abide by code regulations related to patient care, food services, fraudulent sign-offs on medication not present at the facility, etc.

49.     Ms. Hooper was told by Defendants that LHRC was given "one last chance" by the state to bring the facility into legal compliance.  If LHRC failed to do so, it would have to cease operations and "evacuate" the facility by May 31, 2022.  LHRC had conveniently withheld this information from Ms. Hooper when LHRC was courting her to leave her previous employer.

**Racial insensitivity, "Colored people are unruly," and "I'll snatch your license"**

50.     Not only was the facility under threat of losing its license and being imminently shut down by the state, but under Ms. Keith's and Ms. Miles's new management, the work environment at LHRC had become overtly racist and hostile.

51.     Approximately four days prior to Ms. Hooper's sudden termination, Corporate Nurse Miles stated openly while walking past Ms. Hooper, "Colored people are unruly."  Nurse Miles then casually continued down the hall as if the outrageously racist statement she had uttered was so self-evident it did not require elaboration or further comment.

11

52.     Plaintiff Ms. Hooper is African American.  Ms. Miles and Ms. Keith are Caucasian.

53.     It is unclear whether Nurse Miles was directing this comment toward Ms. Hooper, specifically, or African Americans, generally.

54.     Ms. Keith (who uses vulgar language and often directs profanity at African American employees) and Ms. Miles tag-teamed to intimidate nursing staff, including Ms. Hooper, by routinely threatening to take their licenses away.

55.     Any time a nurse would disagree with or so much as question Ms. Keith, she would remind the nurse he or she better comply or **"I'll snatch your license."**

56.     Whenever Ms. Keith received any pushback from any nurse, including from Ms. Hooper, Ms. Keith would state: **"Your license is *sooo* precious. I'm trying to help you keep it. Don't make me take that license away."**

57.     Even for something as simple as a nurse not being able to work on a particular day, Ms. Keith – aware that the facility was understaffed – would coerce said nurse into reporting for work by threatening to "snatch" her license.

### Demand to Falsify Medical Records, Plaintiff's Refusal, & Instant Termination

58.     On or about Sunday, April 17, 2022, after working an **81-hour week**, Ms. Hooper – utterly exhausted from overwork – finally went home to sleep.

59.     Ms. Hooper slept through the next day and was awakened on or about Tuesday, April 19, 2022, by the phone ringing at approximately 7:30 a.m. that morning.

60.     When Ms. Hooper answered, Ms. Keith was on the line screaming hysterically at Ms. Hooper.

61.     Ms. Keith screamed that Ms. Hooper's "whole floor" went "without medication" and was "in the red."

62.    At LHRC, a patient who is "in the red" is one who did not receive his or her medication.  When this occurs, the patient's record in the system is flagged, i.e., is highlighted red, to indicate the patient has not received his or her medication as scheduled.  To remove the red flag, the nurse who administers the medication to the patient has to log in to the Medical Administration Record ("MAR") with his or her unique log in credentials and verify that he or she gave the patient the designated medication at the scheduled time.  In doing so, the nurse certifies and signs off on the patient's record in the MAR.

63.    When medication is not administered as scheduled, a nurse cannot sign off on the medical record and indicate otherwise to "remove the red" without committing fraud.

64.    Hysterical during the phone call, Ms. Keith ordered Ms. Hooper to come back immediately to "fix the red."

65.    Ms. Hooper responded that only one patient (not the whole floor) was "in the red."  Ms. Hooper explained that the reason that particular patient was in the red is because that patient's medication was on back order and not even in the facility.

66.    Ms. Hooper explained she had not signed off on that patient's medical record because she did not – and *could* not – administer medication that was not in the building.

67.    Following this conversation, Ms. Hooper called a colleague working at the facility to verify that only one patient – not the whole floor – was in the red.  That colleague checked the computer system and confirmed the "whole floor" was not in the red but, rather, just the one patient whose medication was on back order.

68.    Shortly after verifying that, Ms. Keith and Ms. Miles called Ms. Hooper to again order her to come back immediately and change the patient's medical record so that LHRC would not get in even further trouble with the state for not administering medication on time.

69.     Ms. Keith demanded Ms. Hooper return, log into the MAR with her credentials, and falsify that patient's record to make it appear as though Ms. Hooper had given the patient this unavailable medication when, in fact, she had not (and could not because it was not available).

70.     Ms. Keith and Ms. Miles had previously chastised Ms. Hooper when she had accurately indicated in patient records that medication was unavailable because they did not want the facility to get cited by the state for not administering medication in a timely manner.

71.     This instruction by management to conceal the unavailability of medication by not noting it in the MAR was a standing order at the facility.

72.     Ms. Keith did not demand that Ms. Hooper come back to actually <u>administer</u> any medication – indeed this was factually impossible because the medication in question was not even in the facility and Ms. Keith and Ms. Miles <u>knew</u> that.  Instead, Ms. Keith expressly demanded that Ms. Hooper return immediately to <u>change</u> the patient's record so that the patient would not be in the red., i.e., so that the record would not show that the patient did not receive his medication when the state inspected the facility's records.

73.     But Ms. Hooper refused. **"No ma'am. No ma'am, that's illegal. I cannot do that,"** Ms. Hooper repeated, explaining that she refused to falsify the patient's medical record because it was against the law.

74.     Ms. Hooper told Ms. Keith and Ms. Miles that it was **"illegal"** to falsely certify that she had given a patient medication she had not administered.

75.     Ms. Hooper explained that what they were asking her to do – falsify that patient's medical record – was a crime in Virginia and she refused to commit a crime despite their threats to her job and license if she refused.

76.     The medication in question was Tramadol, a highly controlled Schedule IV drug.

77.   Hysterical, Ms. Keith escalated her vile threats as she attempted to coerce Ms. Hooper into breaking the law and falsify the patient's record so as to avoid yet another citation from the state.

78.   Ms. Keith **ordered** Ms. Hooper to falsify the patient's medical record or else she would **"snatch her license,"** which she was trying to "protect."  (See **Exhibit 2**.)

79.   Again, Ms. Hooper refused. **"No ma'am. No ma'am. That's illegal,"** Ms. Hooper kept repeating, reiterating that she will not come back to falsify a patient's medical record.

80.   Realizing her fraudulent scheme was proving ineffective, Ms. Keith terminated Ms. Hooper instantly, saying, **"Don't bother coming back. Consider yourself terminated."**

81.   At all times relevant to these facts, Ms. Keith (the DON) and Ms. Miles (the Corporate Nurse), who were in positions of control, supervision, management, and seniority over Ms. Hooper at the facility, were acting as agents of Defendants. As agents of Defendants, all knowledge belonging to, and action committed by, Ms. Keith and Ms. Miles is imputed to Defendants.

82.   Immediately following her termination, Ms. Hooper texted LHRC's Human Resources officer, Ashley, to report the reason she was terminated and to demand the five $400 bonuses she had earned by working five bonus shifts that pay period.  (See **Exhibit 3**.)  LHRC refused to pay this $2,000 bonus Ms. Hooper had earned because it claimed she refused to work shifts during that work period.  Ms. Hooper was prevented from working those shifts due to her unlawful termination.

83.   In the days shortly following Ms. Hooper's sudden termination for refusal to engage in unlawful conduct and commit a crime, Ms. Hooper texted Ms. Keith several times indicating her intention to apply for unemployment benefits and asking what reason she should indicate for

why she was terminated by LHRC. (See **Exhibit 4**.) While Plaintiff knew exactly why she had been terminated (refusing to falsify the record), Plaintiff asked to find out what official reason the company was claiming as the basis for her sudden termination.

84.     Initially, Ms. Keith ignored Ms. Hooper's text messages.

85.     On or about April 22, 2022, Ms. Keith finally texted Ms. Hooper back, directing her to "reach out to [HR] regarding your question[.]" Id.

86.     When HR finally called Ms. Hooper – approximately one week after her sudden termination – HR asked Ms. Hooper why she "quit."  Shocked, Ms. Hooper explained what had actually happened: that she had not quit, but rather had been fired on the phone by Ms. Keith and told not to come back for refusing to falsify the patient's medical record.  Ms. Hooper explained to HR that what Ms. Keith had asked her to do was a crime.

87.     Upon hearing this information, HR asked Ms. Hooper to submit a statement explaining what had happened.

88.     On or about April 28, 2022, Ms. Hooper submitted the requested statement (**Exhibit 5**) to HR by e-mail.

### **Wage Theft – Unpaid wages, bonuses, and incentives**

89.     Ms. Hooper was an hourly employee paid on an hourly basis.

90.     Ms. Hooper was paid $28/hr for standard hours worked as a Charge Nurse at LHRC, plus benefits.

91.     Ms. Hooper was paid $29/hr for all hours worked past 3PM each shift, $30/hr for all weekend shifts and hours worked over 8 each shift, and $31/hr for hours worked past 3PM on weekends or shifts during which time she was scheduled to be off.  These hourly bonus categories are commonly referred to as "shift differentials."

92.     As an hourly employee, Ms. Hooper was entitled to be paid 1.5 times her standard hourly rate for all hours worked over 40 each week.

93.     Ms. Hooper was also promised an additional $10,000 "retention bonus" to be paid over the first eight months of her service at LHRC, (see **Exhibit 6**,) as well as a $400 bonus for each bonus shift she worked during a pay period.

### Underpayment of Overtime Wages

94.     During the April 10, 2022 – April 23, 2022 pay period, Ms. Hooper worked 30.75 hours billed at $28/hr, 15.5 hours billed at $29/hr, 17.25 hours billed at $30/hr, and 17.25 hours billed at $31/hr.  (See **Exhibit 7**.)  Specifically, Ms. Hooper worked the following number of hours on the following dates:

   a.   Monday, 4/11/22: 16.5 hours (8.5 @ $28/hr., 8 @ $30/hr.) + 1 bonus shift;

   b.   Tuesday, 4/12/22: 16 hours (8 @ $28/hr., 8 @ $30/hr.) + 1 bonus shift;

   c.   Wednesday, 4/13/22: 8.5 hours (7.5 @ $28/hr., 1 @ $30/hr) + 1 bonus shift;

   d.   Thursday, 4/14/22: 7 hours (6.75 @ $28/hr., .25 @ $30/hr) + 1 bonus shift;

   e.   Saturday, 4/16/22: 16.25 hours (8 @ $29/hr., 8.25 @ $31/hr.) + 1 bonus shift;

----- New Workweek -----

   f.   Sunday, 4/17/22: 16.5 hours (7.5 @ $29/hr., 9 @ $31/hr.) + 1 bonus shift.[1]

95.     Because Ms. Hooper worked a total of 64.25 hours during the April 10, 2022 – April 16, 2022, workweek, LHRC was required to pay her 24.25 hours of overtime wages at 1.5 times her regular rate of pay.  LHRC acknowledged this duty and paid Ms. Hooper for 24.25 hours of overtime but paid her at the much lower rate of $42/hr. rather than the overtime rate to which

---

[1] Ms. Hooper worked bonus shifts on 4/11, 4/12, 4/16, and 4/17 because she worked a second shift after her scheduled shift ended.  Ms. Hooper worked bonus shifts on 4/13 and 4/14 because she worked shifts she was not scheduled to work.

she was entitled.  Ms. Hooper's correct overtime rate during the April 10, 2022 – April 16, 2022, workweek was **$97/hr.**, and is calculated as follows:

    a.   Ms. Hooper worked a total of 30.75 hours @ $28/hr., 8 hours @ $29/hr., 17.25 hours @ $30/hr., and 8.25 hours @ $31/hr. during this workweek.  This results in unmodified hourly wages of **$1,866.25**;

    b.   Ms. Hooper also worked five additional shifts that entitled her to an additional $400 each, for a total shift bonus of **$2,000** this workweek;

    c.   Ms. Hooper was also promised a retention bonus of $10,000 to be paid over the first 8 months (34.64 weeks) of service at LHRC.  This results in **$288.68** attributed to the April 10, 2022 – April 16, 2022, workweek;

    d.   Adding these categories of earnings produces total base wages of **$4,154.93**.

    e.   Dividing $4,154.93 by the 64.25 total hours worked during this workweek produces a <u>regular rate of pay of **$64.67**</u> ($4,154.93/64.25 = $64.67);

    f.   Therefore, <u>Ms. Hooper's overtime rate during this workweek was **$97**</u> ($64.67 x 1.5) and <u>she was entitled to receive **$2,352.25** in overtime wages for these 24.25 hours rather than the **$1,029.00**</u> that LHRC paid her.

96.    LHRC violated federal and state overtime laws by paying Ms. Hooper at the much lower overtime rate of $42/hr, resulting in an **overtime underpayment of $1,323.25** during the April 10, 2022 – April 16, 2022 workweek.

97.    LHRC further violated federal and state wage theft laws by refusing to pay Ms. Hooper the $2,000 in bonus shifts she worked during the April 10, 2022 – April 16, 2022 workweek.

98.     Ms. Hooper earned $6,455.08 during the April 10, 2022 – April 23, 2022, pay period (not including her retention bonus) and **would have earned $11,117.16 had LHRC not unlawfully terminated her**, preventing her from completing her second workweek within the period.

99.     Ms. Hooper's earnings equate to $289,840.36 per year, plus her $10,000 retention bonus, yielding **total annual earnings of $299,840.36**.

## VI.    CAUSES OF ACTION

### COUNT I
### Violation of Fair Labor Standards Act, 29 U.S.C. § 203 et seq.,
### Underpayment of Overtime & Refusal to Pay $2,000 Earned Bonus

100.    Plaintiff re-alleges and incorporates by reference paragraphs 1-99 as if fully set forth herein.

101.    By virtue of the acts described above, Defendants knowingly paid Ms. Hooper $1,323.25 less in overtime wages than she was entitled to receive.

102.    By virtue of the acts described above, Defendants also knowingly refused to pay Ms. Hooper $2,000 in bonus shift wages that she was entitled to receive.

103.    Under 29 U.S.C. § 216(b) of the FLSA, LHRC is liable to Ms. Hooper in the amount of $3,323.25, plus an additional $3,323.25 in liquidated damages.

104.    Under 29 U.S.C. § 216(b) of the FLSA, LHRC is also liable to pay the attorney fees and costs Ms. Hooper incurred pursuing a remedy in this matter.

## COUNT II
### Violation of Va. Code Ann. § 40.1-29
### Wage Theft

105.    Plaintiff re-alleges and incorporates by reference paragraphs 1-104 as if fully set forth herein.

106.    By virtue of the acts described above, Defendants knowingly withheld $3,323.25 in wages that Ms. Hooper earned while serving as an employee of LHRC.

107.    Under Va. Code Ann. § 40.1-29(J), Ms. Hooper is entitled to recover from LHRC a minimum of $3,323.25 plus an additional $3,323.25 in liquidated damages, plus prejudgment at 8% along with the attorney fees and costs she incurred pursuing a remedy in this matter.

108.    However, because LHRC <u>knowingly</u> failed to pay Ms. Hooper in accordance with state law, LHRC is liable to Ms. Hooper for triple the amount of wages due ($3,323.25), plus prejudgment at 8% along with the attorney fees and costs she incurred pursuing a remedy in this matter.

109.     LHRC acted 'knowingly' because it had actual knowledge of the hours Ms. Hooper worked, the shift differentials she earned, the retention bonus she received, and the bonus shifts she worked during the April 10, 2022 – April 16, 2022, workweek and knew it was required to pay Ms. Hooper in compliance with overtime laws.

110.    LHRC is therefore liable to Ms. Hooper for $9,969.75 (3 * $3,323.25), plus 8% interest from April 23, 2022, along with the attorney fees and costs she incurs pursuing a remedy in this matter.

**COUNT III**
**Violation of Va. Code § 40.1-27.3**
**Virginia's Whistleblower Statute**

111.    Plaintiff re-alleges and incorporates by reference paragraphs 1-99 as if fully set forth herein.

112.    By virtue of the acts described above, Defendants retaliated against Ms. Hooper in violation of Va. Code § 40.1-27.3 when they terminated her employment because she refused to engage in one or more criminal acts that would have subjected her to criminal liability had she complied with her employer's demand.

113.    Under Va. Code § 40.1-27.3(C), Ms. Hooper is entitled to reinstatement, compensation for wages and benefits she lost following her unlawful termination, along with pre-judgment interest of 6%, attorney fees, and costs.

114.    Ms. Hooper has lost $35,323.66 during the 43 days since she was unlawfully terminated on April 19, 2022, and will continue to lose wages at an annual rate of $299,840.36 per year until she is reinstated to her former position, along with any raises she would have earned but for the unlawful termination.  Ms. Hooper is also entitled to compensation for all benefits she lost as a result of being unlawfully terminated.

115.    LHRC is therefore liable to Ms. Hooper for $35,323.66, plus 6% interest from April 19, 2022, along with all additional wages she loses between June 2, 2022, and the date judgment is entered plus the attorney fees and costs she incurs pursuing a remedy in this matter.

**COUNT IV**
**Wrongful Discharge under Virginia Common Law (Bowman Claim)**

116.    Plaintiff re-alleges and incorporates by reference paragraphs 1-99 as if fully set forth herein.

117.    By virtue of the acts described above, Defendants ordered Plaintiff to change a patient's medical record to falsely indicate she had administered medication to the patient that she not only did not administer, but that was not even present in the facility on the date in question.

118.    Defendants knew Plaintiff had not administered this medication but ordered Plaintiff to falsify the patient's medical record and falsely certify that she had administered the medication to him.

119.    Plaintiff had a duty to comply with the law and with regulations designed to protect patient health and safety, including Va. Code § 18.2-260.1, which makes it a crime to falsify patient medical records as Defendants had ordered.

120.    Plaintiff also had a duty to refuse to conspire with Defendants to falsify patient medical records in order to fraudulently maintain the facility's eligibility for government licensing and/or other government programs. This duty arises under Va. Code §§ 18.2-256, 257, which criminalizes conspiracy or attempt to commit a criminal offense, Va. Code § 63.2-522, which criminalizes making false statements to the government or Board of Health, and 18 U.S.C. § 1347-1349, which makes it a federal offense to commit health care fraud by making false statements to receive money or property from the government for which one is not eligible.

121.    Plaintiff refused to comply with the unlawful order she was given by Defendants because she would have committed one or more crimes had she falsely certified that she had administered the medication.

122.    Defendants terminated Plaintiff as a direct and causal result of refusing to violate the law.

123.     As a result of this unlawful termination, Plaintiff is entitled to $35,323.66, plus 6%

interest from April 19, 2022, along with all additional wages she loses between June 2, 2022, and

the date judgment is entered plus all costs she incurs pursuing a remedy in this matter.

124.     Plaintiff is also entitled to punitive damages of up to $350,000 under Bowman v.

State Bank of Keysville, 229 Va. 534 (1985) and the common law of the Commonwealth of

Virginia.

## VII.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ms. Hooper prays that judgment be entered in her favor and

against the Defendants as follows:

a.     That Defendants pay Plaintiff compensatory damages for underpayment of wages

in the amount of $3,323.25, plus an additional $3,323.25 in liquidated damages (or $6,646.50 if

the Court holds Defendants' violation willful), all at 8% interest from April 23, 2022, until paid;

b.     That Plaintiff be reinstated to her position as a Charge Nurse at LHRC or be paid

an appropriate amount in front-pay in lieu of reinstatement;

c.     That Defendants pay compensatory damages for lost wages in the amount of

$35,323.66, plus $821.48 ($299,840.36/365) per day until Plaintiff is reinstated, all at 6% interest

from April 19, 2022, until paid;

d.     That Defendants pay punitive damages in an amount not to exceed $350,000

pursuant to Bowman v. State Bank of Keysville, 229 Va. 534 (1985) and the common law of the

Commonwealth of Virginia.

e.     That Plaintiff be awarded all reasonable attorney fees and costs, pursuant to the Fair

Labor Standards Act, 29 U.S.C. § 203 et seq., Va. Code Ann. § 40.1-29, and Va. Code Ann.

§ 40.1-27.3.

    f.      That Plaintiff be awarded post-judgment interest; and

    g.      That the Court award such other and further relief as is just, equitable, and proper.

**PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE.**

June 2, 2022

                                    LILLIAN HOOPER


                            By:  /s/ Mia Yugo
                                 Mia Yugo
                                 *Counsel for Plaintiff*


Mia Yugo (VSB No. 92975)
Christopher E. Collins (VSB No. 90632)
**YUGO COLLINS, PLLC**
25 Franklin Road, SW
Roanoke, Virginia 24011
Tel: (540) 861-1529
Direct: (540) 855-4791
mia@yugocollins.com
chris@yugocollins.com

*Counsel for Plaintiff*